## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**LES INDUSTRIES WIPECO, INC.,**

      **Plaintiff,**

      **v.**                                    **Case No. 21-2289-JAR-ADM**

**BLUESTEM MANAGEMENT ADVISORS, LLC, et al.,**

      **Defendants.**

## MEMORANDUM AND ORDER

This case involves a failed commercial transaction involving the sale of disposable nitrile gloves.  Plaintiff Les Industries, Wipeco, Inc. ("Wipeco") alleges that it made three 50% deposits for three glove orders, but Defendants Bluestem Management Advisors, LLC ("Bluestem Management"), Bluestem Healthcare, LLC ("Bluestem Healthcare"), and Thomas Johnson (collectively Defendants) failed to perform and Wipeco never received the gloves or its deposits back.  Wipeco alleges four claims: breach of contract against all Defendants (Count I); fraud (Count II) and negligent misrepresentation (Count III) against Bluestem Management and Johnson; and unjust enrichment/quantum meruit against all Defendants (Count IV).  Now before the Court is Wipeco's Motion for Partial Summary Judgment (Doc. 77) against Bluestem Management only on Count I and Count IV, and Defendants' Motion for Summary Judgment (Doc. 79) against Wipeco on all counts.  The matter is fully briefed, and the Court is prepared to rule.  For the reasons explained in detail below, the Court denies Wipeco's motion for partial summary judgment on the breach of contract claims in Count I and the unjust enrichment claims in Count IV; and denies Defendants' summary judgment on the breach of contract claims in Count I, grants Bluestem Management and Johnson summary judgment on the fraud and

negligent misrepresentation claims in Counts II and III, and grants Defendants summary judgment in part on the unjust enrichment claim in Count IV.  The Court also orders Wipeco to submit supplemental briefing on the breach of contract claims against Bluestem Healthcare and Johnson.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving

---

[1]Fed. R. Civ. P. 56(a).

[2]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[11]  A genuine issue of material facts must be supported by "more than a mere scintilla of evidence."[12]

When, as here, an affirmative defense is raised at the summary judgment stage, the moving party "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts to rebut the movant's case."[13]  Only if the moving party meets this burden must the nonmoving party come forward and "demonstrate with specificity the existence of a disputed material fact."[14]

The Court applies this same standard to cross motions for summary judgment.  Each party bears the burden of establishing that no genuine issue of material facts exists and no entitlement to judgment as a matter of law.[15]  "Cross motions for summary judgment are to be

---

[7] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[10] *Adler*, 144 F.3d at 671.

[11] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[12] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997).

[13] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (citations omitted).

[14] *Hesterlee v. Cornell Cos. Inc.*, 351 F. App'x 279, 281 (10th Cir. 2009) (quotation marks, emphasis, and citation omitted).

[15] *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

treated separately; the denial of one does not require the grant of another."[16]  But where the cross motions overlap, the Court may permissibly address the legal arguments together.[17]  Each motion is viewed in the light most favorable to the non-moving party.[18]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[19]  "At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences."[20]

## II.    Uncontroverted Facts

The following material facts are either uncontroverted, stipulated, or viewed in the light most favorable to the non-moving party.  The Court excludes evidence offered through affidavits and deposition testimony that would not be admissible at trial, including evidence that is not relevant,[21] evidence that is hearsay for which no exception to the hearsay rule is apparent,[22] and evidence that is not based on the witness's personal knowledge.[23]  Furthermore, the Court disregards conclusory allegations without specific supporting facts that do not have probative value[24] and "statements of mere belief."[25]  The Court does not consider facts presented by the

---

[16] *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) (citation omitted).

[17] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

[18] *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

[19] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[20] *Bacon v. Great Plains Mfg., Inc.*, 958 F. Supp. 523, 526 (D. Kan. 1997) (citation omitted).

[21] Fed. R. Evid. 401.

[22] Fed. R. Evid. 801–807.

[23] Fed. R. Evid. 602.

[24] *Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1143 (10th Cir. 2005) (citations omitted).

[25] *Argo v. Blue Cross Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)).

parties that the record does not support or that are not relevant to the legal issues presented.  Nor does the Court consider legal arguments included in the parties' statements of fact.

Wipeco is engaged in the business of reselling personal protective equipment ("PPE"), including disposable nitrile gloves.  Thomas Johnson, dba Bluestem Investments, is the sole member of Bluestem Management Advisors and Bluestem Healthcare, which are both limited liability companies.  Bluestem Management is engaged in the business of supplying PPE.  Both Wipeco and Bluestem Management are merchants engaged in the sale of goods within the meaning of the Kansas Uniform Commercial Code ("UCC").[26]

On October 30, 2020, Wipeco, through its president Jonathan Kaufman, contacted Johnson of Bluestem Management, an importer with manufacturing contacts in Asia, to inquire about purchasing nitrile gloves and the parties began negotiations.  At that time, there was extreme demand for PPE due to the COVID-19 pandemic.

In the context of nitrile gloves, "mil" refers to the thickness of the gloves; the higher the number, the thicker the glove.  During the COVID-19 pandemic, factories were primarily producing thinner, 2 or 3 mil gloves, and thicker gloves, such as an 8 mil, were hard to find.

On November 5, 2020, Bluestem Management provided Wipeco with it Gloves Terms Agreement dated October 30, 2020, which had payment terms of 50% due upon receipt of the purchase order[s] but is silent regarding the second 50% payment.  The Agreement required "[f]unds to be held in a USA bank with an Escrow Account and Managed by a US law firm," and stated that "[f]actory payments will be made incrementally as production levels are obtained."[27] The Agreement instructed payments to be made payable to Bluestem Management, with wiring

---

[26] Doc. 76 ¶ 2.a.vii, x.

[27] Doc. 80-5.

and direct deposit instructions.[28]  The Agreement further provides: "All products are sold as an outright sale—NO Returns, NO Cancellations after order has been placed," and "Due to extreme volatility of PPE products, FORCE MAJEURE may apply."[29]

On November 13, 2020, Kaufman, Johnson, and Tim Lauer, National Account Manager for Bluestem Healthcare, engaged in an email exchange wherein Wipeco provided "Bluestem" with a non-binding letter of intent to purchase gloves from Bluestem.[30]  That non-binding letter of intent stated, *inter alia*, that payment terms were 50% down with purchase order and 50% balance due prior to factory release.

On December 10, 2020, Kaufman wrote to Johnson to ask when an initial order for gloves would ship and if it could be listed on the contract.  Johnson responded that factories did not advise of shipping dates until after receipt of the deposit, a letter of intent, and a "hard" purchase order.[31]

On or around December 14, 2020, the parties exchanged a purchase order for 8 mil gloves.  The 8 mil purchase order and accompanying email stated that the payment terms were "50% Due Upon Receipt of PO, 50% Balance Due with BOL."[32]  On December 15, 2020, Kaufman again asked Johnson if it was possible to put the delivery dates on the contract so that he could advise clients when the gloves would be available.  Johnson responded yes, but that the ship dates would be "tentative dates, subject to change."[33]  The next day, Johnson advised Kaufman that the suppliers would give delivery dates as soon as they received the 50% deposit,

---

[28] *Id.*

[29] *Id.*

[30] Doc. 80-6.

[31] Doc. 80-7.

[32] Docs. 78-8, 78-9

[33] Doc. 80-8.

which was needed that day, and that his best guess for delivery was the last week of January or the first week of February 2021.[34]  On December 16, 2020, Wipeco wired $248,657.50 to Bluestem Management's account for the initial 50% deposit for its first order of 8 mil gloves.

On January 29, 2021, Wipeco delivered three purchase orders to Bluestem Management as follows: 35,000 boxes of 8 mil gloves (the "First 8 mil Order"); 35,000 boxes of 8 mil gloves (the "Second 8 mil Order"); and 35,000 boxes of 4 mil gloves (the "4 mil Order").  The parties stipulate that in part, the payment terms governing the transactions between Wipeco and Bluestem Management were 50% due with the purchase order and the remaining 50% due when Bluestem Management provided Wipeco with a bill of lading.[35]  At the time of these transactions, the global supply chain faced delays and disruptions due to a resurgence of the COVID-19 pandemic in Asia.

### *8 Mil Orders*

Bluestem Management contracted with Sunshine Garden Tools Company, Ltd. ("Sunshine Garden") to supply Wipeco's First and Second 8 mil Orders.  Sunshine Garden is also known as Shen Xiang Garden Tools Company, Ltd.  Bluestem Management arranged for Sunshine Garden to deliver an 8 mil glove sample to Wipeco.  After Wipeco rejected the first sample because it failed to conform to industry standards for the weight of 8 mil gloves, Bluestem Management arranged for Sunshine Garden to produce and deliver a second sample. The second sample received on January 27, 2021, was the proper weight.

On February 5, 2021, Wipeco wired $248,657.50 to Bluestem Management's account for the initial 50% deposit for the Second 8 mil Order.  On Sunshine Garden's instruction, Bluestem

---

[34] *Id.*

[35] Doc. 76 ¶ 2.a.xiv.

Management remitted Wipeco's deposit for the First 8 mil Order to HK Hengjin Trading Limited ("HK Trading"), a Sunshine Garden affiliate located in Zhongshan City, Guangdong China. Defendants do not know where the deposit for the Second 8 mil Order went.[36]

In March 2021, Sunshine Gardens attempted to increase the price of both of the 8 mil Orders, which was unacceptable to both Bluestem Management and Wipeco. On March 24, 2021, Johnson sent Kaufman an email stating:

> We are sending demand letter to supplier on you [sic] 8 mil PO, due to the fact they didn't provide the full USA 8 mil glove thickness at the price they originally quoted, and attempted to use two 4 mil gloves as their "8 mil version". And then they came back at a higher price of over $0.197 per glove price. We are engaged with them directly, and will expect and demand full restitution of your deposits. We are engaging Chines [sic] legal counsel to pursue.[37]

On March 11, Johnson provided Kaufman with Sunshine Garden's new price—a 22% increase. Kaufman responded that the price increase was too much, that he could not get his clients to accept that, that he thought they needed to tell the factory to return the deposit money, and enclosed his wire transfer details. The next day, Johnson emailed Sunshine Gardens to relay "[t]hey [Wipeco] require the money back."[38]

On March 25, 2021, Johnson communicated with Sunshine Garden representatives Anna Su and Edward Lee via email with the subject line: "CLIENT REQUIRES ALL THEIR DEPOSIT BACK—YOUR factory did not provide what the purchase require [sic]—USA 8 MIL Gloves: 8 Mil Glove resolution."[39] Johnson stated:

---

[36] On February 17, 2023, Magistrate Judge Angel D. Mitchell entered an order reopening discovery on the limited topic of what happened to Wipeco's deposits. Doc. 106. That discovery is at a standstill, however, as the corporate defendants are not currently represented by counsel. Doc. 128.

[37] Doc. 78-3.

[38] Doc. 80-20.

[39] Doc. 80-21.

> The buyer will not accept a higher price than $0.18 per 8 mil USA glove.  This is exactly what is on the purchase order—AND the first factory tried to create an [sic] non full 8 mil glove as a substitute.  This is not acceptable, he required [sic] 100% of the full deposit in two weeks-due by April 9th, 2021.  If not received back to me by that date, he will go to lawyers and fill [sic] lawsuit, unfortunately. . . . I would suggest that Edward submit the deposit back to BLUESTEM-so no one has to go to CHINA court.[40]

The next day, Johnson told Sunshine Gardens that the sample 8 mil glove was "ok but not at that price.  He is demanding his refund."[41]

On March 29, 2021, after Sunshine Garden indicated that it could provide the 8 mil gloves at the original lower price, Johnson responded to relay some "mandatory conditions": (1) the glove sample must be the real USA full 8 mil thickness, no fakes; (2) the gloves must be 100% nitrile, not a blend; and (3) the gloves must have SGS/TUV inspection report.[42]  Johnson stated that if these conditions were met, the buyer will accept it, but if not, "Edward and factory must provide 100% refund within seven days [to] BlueStem!"[43]

On April 22, 2021, Kaufman emailed Johnson regarding their mutually agreed upon deadline for getting the following information about the gloves: (1) the ship date; (2) photos of the boxes; and (3) color of the glove.  Kaufman expressed his frustration and said he "cannot accept any more delays from the factory, they have strung us along for 2 months, . . . yet they are holding on to Wipeco's funds."[44]  Johnson forwarded Kaufman's email to Sunshine Garden and told Su and Lee that Kaufman's questions needed to be answered that night, adding that it was

---

[40] *Id.*

[41] *Id.*

[42] Doc. 80-22.

[43] *Id.*

[44] Doc. 80-23

"[e]xtremely critical!"[45]  After Sunshine Garden responded that shipping would be further delayed, Johnson responded on April 23, 3021: "This is unacceptable.  Return the deposit or tell factory to ship it within 3 weeks.  Otherwise [Wipeco] will take legal action for the money back to him.  Call me the minute you get this."[46]  Sunshine Garden responded that if the factory could not move the delivery to an earlier date, "we will discuss [with] factory to return back the money, will keep you post [sic] by tomorrow."[47]

On April 28, 2021, Johnson emailed Kaufman with an update on the status of the 4 mil Order and to relay that with respect to the 8 mil Order, the "factory flipped and said they can ship in May; I said no- and to issue the refund.  Have informed them with a demand letter with firm refund timing.  Am talking to them tonight, with very sharp demand."[48]  After Kaufman followed up to see how the factory reacted to Johnson's firm demand, on April 30, 2021, Johnson replied, "[t]hey agreed to refund it.  I am following with timing this [weekend]."[49]

Three weeks later, with still no refund of the 8 mil Orders deposits, Johnson responded to Kaufman's pleas for status updates with vague assurances that some kind of legal action had been taken with Sunshine Garden.  This prompted a May 13, 2021 email to Johnson from Steve Rees, Wipeco's owner, urging him to wire the payments for the 8 mil Orders "by midweek or we will have [no] option but to proceed with legal action."[50]  Johnson responded to Rees that "[w]e are expecting refunds to start coming in first of next week."[51]  On May 18, 2021, Johnson again

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] Doc. 78-10.

[49] *Id.*

[50] Doc. 78-2.

[51] *Id.*

represented to Rees that "the refund process in the attorneys right now," and once they received the refunds, Wipeco would be reimbursed within 24 to 48 hours.  Rees followed up seeking clarification from Johnson on May 21, 2021, stating, "I know you have said it is in litigation right now—but WHERE are [we] really on this.  I think we are owed a much more detailed response."[52]  Johnson replied that day, "[w]e have set in motion legal filings on this with our attorneys.  I am on a call with them tomorrow morning with more details.  Once [we] have them we will share all details we are allowed to, You will receive a full refund for this 8 mil glove deposit."[53]  Wipeco never received a refund or bill of lading on the 8 mil Orders.

### 4 Mil Order

On February 9, 2021, Wipeco wired $187,750.00 to Bluestem Management's account for the initial 50% deposit under the 4 mil Order.  Under the 4 mil Order invoice, the payment terms per container were "50% Due Upon Receipt of PO, 50% Balance Due with BOL."[54]  Bluestem Management contracted with BestSafe Glove Company, Ltd. ("BestSafe") to supply Wipeco's 4 mil Order.  Bluestem Management remitted Wipeco's deposit for the 4 mil Order to BestSafe.

On May 25, 2021, Johnson provided Kaufman an update on the 4 mil Order, advising that there was "extremely tight container load on ships," and "a deep backlog that CEVA is clearing as we speak.  The minute CEVA has another slot, your container is it, first."[55]

On May 27, 2021, Corrie Phillips, Bluestem Management's Manager of Special Projects, informed Wipeco that the 4 mil Order was ready to be shipped and asked Wipeco to remit the remaining 50% payment.  Bluestem Management indicated that the order had not yet shipped

---

[52] *Id.*

[53] *Id.*

[54] Doc. 78-6.

[55] Doc. 80-18. The Court takes judicial notice that  CEVA Logistics is a global logistics and supply chain company.  https://www.cevalogistics.com/en/what-we-do/ocean-freight (last accessed June 28, 2023).

due to "delays at the port," but was scheduled to set sail on June 6, 2021.[56]  After Kaufman requested a bill of lading and requisite paperwork, Phillips provided Wipeco with: (1) a revised pro forma invoice; (2) a "draft" bill of lading; (3) a packing list showing the sizes and quantities of gloves; and (4) an inspection report.[57]  Phillips further indicated that the shipping container only had 25,000 boxes of gloves but that the remaining 10,000 boxes would ship within the next four or five days, and requested Wipeco to remit payment that day or the next.  Kaufman responded on June 9 that he only wanted one shipping container and to cancel the remaining 10,000 boxes and that a draft bill of lading would not suffice.  Phillips replied that the draft bill of lading "is all we have until they work through all the containers on the ship.  All ports are jammed so the cargo is being received in Long Beach[,] California," instead of to a port in Canada.[58]

The next day, Phillips sent a revised bill of lading, along with a request that Wipeco "[w]ire the funds owed or we will not be able to release the container."[59]  When Kaufman replied that he needed the actual bill of lading, Johnson responded that Best would not release the gloves without the final payment, the draft bill of lading is a legal document that complies with logistics law, and if the final payment was not received by Bluestem within 24 hours, Wipeco would lose the container of gloves, which would result in another delay until the payment is received. Kaufman responded that per the terms of their agreement, Wipeco required a copy of the bill of lading, commercial invoice and packing slip, and certificate of origin, as well as proof that the actual container was on its way and headed to Wipeco.  Phillips confirmed on June 10, 2021, that

---

[56] Doc. 80-25.

[57] *Id.*

[58] *Id.*

[59] *Id.*

the container had not left the port and again requested Wipeco to wire the balance due or the container would be delayed even further.  Wipeco did not remit the remaining 50% of amounts owed and filed this lawsuit fifteen days later.

## III.    Analysis

### A.    Breach of Contract

The parties agree that Kansas UCC sales provisions and general contract principles govern the breach of contract claims in this case.  Under Kansas law, the elements of a breach of contract claim are: "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach."[60]  The parties do not dispute the existence of a contract between merchants, so only elements 3, 4, and 5 are at issue.[61]

Wipeco moves for partial summary judgment against Bluestem Management only on Count 1, the Breach of Contract claims for the 8 mil Orders and 4 mil Order, on the grounds that for each glove order, Bluestem Management: (1) failed to deliver a bill of lading; (2) failed to deliver the gloves or a refund of Wipeco's deposit after the parties agreed to modify the no returns/no cancellation provision; and (3) failed to hold Wipeco's deposit in escrow or make incremental payments to the factories.

Defendants collectively move for summary judgment on Count 1, on the grounds that Wipeco's Breach of Contract claims fail as a matter of law, specifically: (1) the Gloves Terms Agreement expressly provided for flexible delivery dates of the glove orders, which could not be

---

[60] *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citations omitted).

[61] *See* Doc. 76 at 2–3, 10–13.

cancelled or refunded after the order has been placed; (2) that Wipeco failed to perform and repudiated its performance; and (3) that Wipeco waived or acquiesced to any argument as to the escrow funds.  Defendants also move for summary judgment on two affirmative defenses: (1) that even if the parties had contracted for certain delivery dates, K.S.A. § 84-2-615 excuses a seller from timely delivery of goods contracted for where its performance has become commercially impracticable, so long as the seller notifies the buyer that there will be delay or non-delivery; and (2) that the Gloves Terms Agreement contained an explicit *force majeure* provision that excuses any purported delay in delivery.

**1.     8 Mil Orders**

**a.     Modification of Glove Terms Agreement**

The parties have stipulated that the Gloves Terms Agreement provided "NO Returns, NO Cancellations after order has been placed."  Defendants argue that this unambiguous provision precludes Wipeco's breach of contract claim as a matter of law.  In its motion for partial summary judgment, however, Wipeco relies on K.S.A. § 84-2-209 to argue that after the glove manufacturer requested a price increase that both Wipeco and Bluestem Management found to be unacceptable, the parties agreed to modify the Glove Terms Agreement to provide a refund of Wipeco's 8 mil Orders and that Bluestem Management breached that modified agreement when it failed to refund the deposits.  Defendants respond that the parties did not mutually agree to modify the contract in the way Wipeco claims and any purported modification is not a signed writing as required by the Kansas UCC.

Under § 84-2-209, a contract may be modified without consideration.  A modification "is the changing of the terms of the agreement which may diminish or increase the duty of either

party."[62]  "Proposed amendments that materially alter the original agreement are not considered part of the contract unless both parties agree to the amendments."[63]  Section 84-2-209 requires express assent to the proposed modifications.[64]  "When a contract is modified and there is a breach of the contract, it is the contract as modified that is breached.  Therefore, the rights of the parties should be determined on that basis, just as though the modified form of the contract was the only contract that had ever existed."[65]  Whether a term of a written contract has been modified by a subsequent agreement is a question of fact.[66]

Defendants argue that Wipeco's modification argument fails under the Kansas UCC for several reasons.  First, Defendants argue that a modification requires a signed writing under § 84-2-209, which requires compliance with the statute of frauds in § 84-2-201.  That section, in turn, requires that "there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent."[67]  The comment to § 84-2-201 defines "signed" as including "any authentication which identifies the party to be charged."[68]

Wipeco argues that the May 21, 2021 email from  Johnson stating, "You will receive a full refund for this 8 mil glove deposit," qualifies as a signed writing.[69]  That email ends with a standard email signature block that includes the name of the sender—Tom Johnson—and his

---

[62] 2A Anderson, Uniform Commercial Code § 2-209:49 (3d ed. 1997).

[63] *Wachter Mgmt. Co. v. Dexter & Chaney, Inc.*, 144 P.3d 747, 752 (Kan. 2006) (citation omitted).

[64] *Id.* (collecting cases).

[65] 2A Anderson, Uniform Commercial Code § 2-209:22 (3d ed. 1997).

[66] *Saddlewood Downs, L.L.C. v. Holland Corp.*, 99 P.3d 640, 646–47 (Kan. Ct. App. 2004) (citing *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 582 P.2d 1111 (Kan. 1978)).

[67] K.S.A. § 84-2-201.

[68] *Id.* cmt. 1.

[69] Doc. 78-2 at 1.

15

position—Chair, CEO Bluestem Management Advisors, LLC.[70]  Therefore, under the Kansas UCC statute of frauds, this email from Bluestem Management's CEO with an electronic signature block qualifies as a signed writing by the party against whom enforcement is sought.

Second, Defendants argue that Wipeco cannot rely on § 84-2-711 to show that it is entitled to a refund of its deposits because the Gloves Terms Agreement did not permit cancellations or refunds.  That statute provides, in relevant part, "[w]here the seller fails to make delivery . . .the buyer may cancel" and recover "so much of the price as has been paid." Bluestem argues that the parties varied the effects of this provision of the UCC by explicitly including the no returns/no cancellation provision in the Gloves Term Agreement.  As Wipeco stresses, however, it does not claim a statutory right to a refund of the 8 mil Orders deposits under the Kansas UCC.  Rather, it argues that the parties agreed to modify the terms of the 8 mil Orders to require a refund of Wipeco's deposits.

Finally, Defendants argue that there was no mutual assent to the purported modification of the Glove Terms Agreement.  Wipeco argues that the record shows that Bluestem Management unequivocally agreed to refund Wipeco's deposits due to the issues with the price increases.  It points to Johnson's statements that Bluestem Management would "expect and demand full restitution" of Wipeco's deposits, confirmed that the supplier "agreed to refund it," and confirmed to Wipeco that "[y]ou will receive a full refund for this 8 mil glove deposit."[71] Wipeco further argues that Bluestem Management acted consistently with that modification by trying to obtain a refund from its suppliers and do not suggest that it took any action indicating

---

[70] The Electronic Signatures in Global and National Commerce Act, 15 U.S.C. § 7001, provides that in all transactions in or affecting interstate or foreign commerce, a contract or other record relating to the transaction shall not be denied legal effect merely because it is in electronic form.

[71] Doc. 92 at 28.

that it rejected any request for a refund from Wipeco per the original terms of the Gloves Terms Agreement.  Defendants argue that Wipeco's attempt to modify the Gloves Terms Agreement was unilateral, that Bluestem's promise to obtain a refund was conditioned on whether it was successful in obtaining a refund from its supplier, and at no point in the parties' discussions did Bluestem Management unconditionally agree to cancel Wipeco's orders and provide a full refund.  This issue presents questions of disputed material fact and is therefore unsuitable for determination on a cold summary judgment record.[72]  Accordingly, both Wipeco's and Defendants' motion for summary judgment are denied on this ground.

### b.      Failure to Deliver Bill of Lading or Gloves

In their response, Defendants anticipate that Wipeco may assert that if the Court disagrees that the parties modified the contract with respect to the 8 mil Orders, Bluestem Management breached the terms of the original agreement by failing to provide the gloves or a bill of lading.   As Defendants point out, while the headings reference it, Wipeco's brief in support of its motion for partial summary judgment contains no substantive argument supporting this claim.[73]  Accordingly, Defendants argue that Wipeco has waived and/or abandoned any argument that it should be granted summary judgment on the basis that Bluestem Management breached the original agreement by failing to deliver the gloves or a bill of lading.  Wipeco addresses this issue in its reply and urges that it has not abandoned this argument, which it characterizes as "self-explanatory."[74]  The Court disagrees.  While the alternative claim that

---

[72] *See Saddlewood Downs, LLC v. Holland Corp, Inc.*, 99 P.3d 640, 646–47 (Kan. Ct. App. 2004) ("Whether a term of a written contract has been modified or waived by a subsequent agreement is a question of fact for the trial court."); *Cont'l W. Ins. Co. v. KFS, Inc.*, 59 P.3d 1, 5 (Kan. Ct. App. 2002) (same).

[73] *See* Doc. 78 at 8–10.

[74] Doc. 99 at 9–10.

Bluestem Management breached the original agreement is preserved in the Pretrial Order,[75] the Court can discern no substantive argument or citation to legal authority supporting that claim in its original brief in support of its partial motion for summary judgment.[76]  The Court thus deems this inadequately briefed argument on this issue waived, and Wipeco's motion for summary judgment is denied on this ground.

### c.      Failure to Hold Deposits in Escrow Account

Wipeco next argues that Bluestem Management breached the Gloves Terms Agreement by not holding Wipeco's deposits for the 8 mil Orders in escrow.  Bluestem Management admits that it did not hold Wipeco's deposits in escrow, but denies that this constitutes a breach because it told Wipeco the suppliers required 50% payment up front, that Wipeco acquiesced in the up-front payment and/or waived the escrow requirement because it wired its deposits directly to Bluestem Management, and Wipeco did not suffer any damage as a result of the failure to hold its deposits in escrow.

K.S.A. 84-2-202 states that the terms of a written agreement "may be explained or supplemented . . . by course of performance, course of dealing or usage of trade [pursuant to] 84-1-303 . . . ."  Section 44-1-303 defines "course of performance" as

> a sequence of conduct between the parties to a particular transaction that exists if: (1) The agreement of the parties with respect to the transaction involves repeated occasion for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.[77]

---

[75] Doc. 78 ¶ 4.a.i and ii.

[76] *See Eateries, Inc. v. J.R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) ("A party forfeits an issue it does not support with 'legal authority or argument.'") (quoting *Clark v. State Farm Mut. Auto. Ins. Co.*, 319 F.3d 1234, 1244 (10th Cir. 2003)).

[77] K.S.A. 84-1-303(a).

Such a course of performance is "relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement."[78]

Defendants argue that while the Gloves Terms Agreement references the use of an escrow account, by the time Wipeco placed its December 2020 and January 2021 8 mil Orders and deposits, an escrow account was no longer commercially reasonable and Bluestem Management made clear that the manufacturer required a 50% deposit up front to secure production.  Defendants argue that as a result, Wipeco knew and consented, or at least acquiesced, to Bluestem Management providing the initial 50% deposits directly to the manufacturer.  Defendants point to the fact that the parties did not agree to any specific terms governing an escrow account, did not appoint an escrow agent, had no agreement on how funds would flow to and from any escrow account, and that Wipeco remitted its deposit payments to Bluestem Management directly.  It contends that Wipeco never objected to this approach and thus cannot base a breach of contract claim on this conduct.

Wipeco argues that absent from any communications from Bluestem Management about the deposits is any indication that the money was not being held in an escrow account, there is no explicit communication to the contrary, and no unequivocal agreement by Wipeco to waive that requirement.  Wipeco further asserts that, had Bluestem Management utilized an escrow account, it could have returned Wipeco's deposits when the supplier purportedly failed to provide the refund, thus damaging Wipeco.

As with the modification argument, the Court finds that this issue presents a question of disputed material fact and is therefore unsuitable for determination at summary judgment.  The

---

[78] K.S.A. 84-1-303(d).

parties' motions for summary judgment are denied on this ground with respect to the 8 mil Orders.

### 2.    4 Mil Order

#### a.    Failure to Deliver Bill of Lading or Gloves

Wipeco claims that after it wired its initial deposit for the 4 mil Order, Bluestem Management failed to perform because it never delivered a bill of lading or any gloves.  Instead, Wipeco contends that Bluestem Management attempted to coerce Wipeco into paying the 50% balance early by sending a "draft" bill of lading, which was a breach of the payment terms. Because Bluestem Management never satisfied its obligations under the contract by providing a bill of lading sufficient to trigger the second payment for the 4 mil Order, Wipeco argues that Bluestem Management breached the contract and it is entitled to the return of its deposit and lost profits.

In response, Defendants argue that Bluestem Management was not required to deliver the gloves or a bill of lading by any fixed date and that the parties varied the effects of this provision of the UCC by explicitly including the no returns/no cancellation provision in the Gloves Term Agreement.  It further contends that it did not breach the 4 mil Order because, per Wipeco's non-binding letter of intent, the second 50% payment was due prior to factory release.  Wipeco argues that Bluestem is attempting to recant the parties' stipulation in the Pretrial Order that the payment terms under the Gloves Terms Agreement were 50% due with the purchase order and the remaining 50% due when Bluestem Management provided Wipeco with a bill of lading.[79] Bluestem argues that the stipulation was prefaced with "in part," that the Gloves Terms Agreement is silent regarding the timing of the second 50% payment, and that the letter of intent

---

[79] Doc. 76 ¶ 2.a.xvi.

speaks to the parties' understanding and the circumstances of the agreement with respect to the payment terms.  Wipeco responds that even if the letter of intent applied, it was sent to an agent of Bluestem Healthcare, and was rendered legally irrelevant by a subsequent agreement of the parties modifying that non-binding agreement, specifically emails between the parties and the purchase orders.

Although the Gloves Terms Agreement does not include a fixed date for delivery, Wipeco stresses that it does not base its breach of contract claim on delivery delays but rather, on grounds that Bluestem Management wholly failed to perform by not providing a bill of lading and not delivering the gloves.  It is undisputed that the parties reached an impasse when Bluestem Management asked Wipeco to make the second installment before receiving a final bill of lading.  The question for the Court is how the law applies to these facts.

The cardinal rule of contract interpretation under Kansas law is that the court "must ascertain and give effect to the parties' intent."[80]  If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying the rules of construction.[81]  That is, the court must enforce the contract as written.[82]  Wipeco argues that Bluestem Management's insistence on an early payment from Wipeco was a breach of the contract payment terms and thus Wipeco appropriately refused to pay the second installment without a "real" bill of lading and instead filed this lawsuit.  Defendants argue that these facts reflect an anticipatory repudiation because, instead of waiting out its order as required by the

---

[80] *Beaty v. Kan. Athletics, Inc.*, 454 F. Supp. 3d 1096, 1109 (D. Kan. 2020) (citing *McGlon v. Sprint Corp.*, No. 16-2099-JAR, 2019 WL 1847035, at *5 (D. Kan. Apr. 18, 2018)).

[81] *See Peterson v. Ferell*, 349 P.3d 1269, 1274 (Kan. 2015).

[82] *Id.*

contract, Wipeco unilaterally decided that it had waited long enough, purported to cancel the 4 mil Order, and filed this lawsuit seeking return of its deposits.

The Court first considers the parties dispute over the contract payment terms.  The Glove Terms Agreement is silent regarding the timing of the second 50% payment, but was subsequently addressed in the non-binding letter of intent, emails, and purchase orders.  Because the intent of the parties is not clear in the Agreement, the Court may properly consider parol evidence to show the actual agreement between the parties.[83]

Here, Wipeco and Bluestem Management understood and agreed to the terms for the second 50% payment.  It is uncontroverted that the November 2020 *nonbinding* letter of intent stated that the second payment was due prior to factory release.  On December 10, 2020, however, Corrie Phillips emailed Kaufman regarding the updated purchase order for the First 8 mil Order "reflecting the corrections."[84]  She specified that Wipeco is required to put 50% down on first shipment and the "[r]emaining balance due with BOL."[85]  Kaufman replied, "Pas de problem (no problem)."[86]  The December 9, 2020 purchase order stated terms of sale as "50% Due Upon receipt of PO, 50% Balance Due with BOL."[87]  Likewise, it is uncontroverted that under the 4 mil Order invoice, the payment terms per container were likewise "50% Due Upon Receipt of PO, 50% Balance Due with BOL."[88]  To the extent there was any prior agreement

---

[83] *See, e.g.*, *In re Goff's Estate*, 379 P.2d 225, 235 (Kan. 1963) ("It has regularly been held that where a contract is incomplete or silent in any particular, parol evidence is admissible to show the actual agreement between the parties, and this is not limited to cases where there is ambiguity.  The parol evidence rule is not violated when such evidence tends to show the relation of the parties and the circumstances under which the instruments were executed.") (internal citations omitted).

[84] Doc. 78-8.

[85] *Id.*

[86] *Id.*

[87] Doc. 78-9.

[88] Doc. 78-6.

with Bluestem Management, those communications and purchase orders modified the non-binding letter of intent.  Unlike the 8 mil Orders, the record is clear that there was mutual assent to this purported modification.[89]  Accordingly, it is uncontroverted that the second 50% payment under the 4 mil Order was not due under the payment terms of the contract until receipt of a bill of lading.[90]  And according to Wipeco, Bluestem Management's demand for early payment constitutes a breach of those contract payment terms.

But Defendants view the circumstances differently.  Defendants argue that the Gloves Terms Agreement provides for flexible delivery dates that could not be cancelled or refunded, and that Wipeco chose to proceed with its purchase because it was eager to capitalize on the high-demand PPE market during the COVID-19 pandemic.  Instead of simply waiting on a final bill of lading and paying the remaining amounts due for the gloves it ordered, Defendants contend that Wipeco anticipatorily repudiated or breached the 4 mil Order.  Section 84-2-610 allows a party to a contract to "suspend his own performance" when the other party "repudiates the contract with respect to a performance not yet due."  Section 84-2-610 provides in part that when either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may resort to any remedy for breach and may suspend his own performance.  "Anticipatory repudiation centers upon an overt communication of intention or an action which renders

---

[89] *See* K.S.A. § 84-2-209 (stating modifications to contract need no consideration to be binding).

[90] Defendants' claim that the stipulation regarding the payment terms in the Pretrial Order is qualified by "in part" is not well-taken.  As Wipeco points out, a deadline based upon a bill of lading versus prior to factory release are mutually exclusive and contradictory.  Absent any argument that the stipulation is unclear or ambiguous, "it is not a manifest injustice to hold the parties to those stipulations."  *Glover v. NMC Homecare, Inc.*, 13 F App'x 896, 902–03 (10th Cir. 2001) (citation omitted).

performance impossible or demonstrates a clear intention not to continue with performance."[91] "Under Kansas law, anticipatory repudiation is a breach of contract."[92]

Thus, the question becomes whether either party breached its obligations under the contract and, if so, what is the proper remedy. "These questions can rarely—if ever—be decided by way of summary judgment."[93] Wipeco argues that Bluestem Management's insistence that Wipeco pay without a final bill of lading is a breach of the contract terms, while Bluestem Management argues that Wipeco's refusal to wait for a final bill of lading—which had no deadline and was purportedly hindered by shipping delays caused by the COVID-19 pandemic— and pay the remaining amount for the gloves constitutes an anticipatory breach of its continuing obligation under the contract, relieving Bluestem Management from its obligation to deliver the gloves. Whether a contract was breached is a question of fact.[94] Similarly, "[w]hether any action of one party is sufficient to constitute a repudiation of the contract and amount to an anticipatory breach is a question of fact for the jury."[95] The Court finds it should be left to the finder of fact to determine whether Bluestem Management's actions amount to a breach of contract or whether Wipeco's actions rise to the level of "a clear and unequivocal refusal to perform" contractual obligations. These disputed issues of material fact preclude the entry of summary judgment on behalf of either party on this claim.

---

[91] *Aero Consult. Corp. v. Cessna Aircraft Co.*, 867 F. Supp. 1480, 1491 (D. Kan. 1994) (citing K.S.A. § 84-2-610, cmt. 2).

[92] *Hawkinson v. Bennett*, 962 P.2d 445, 472 (Kan. 1998).

[93] *Sheridan Cnty. Health Complex v. Parsons*, 520 P.3d 794 (Table), 2022 WL 17544438, at *3 (Kan. Ct. App. Dec. 9, 2022).

[94] *Peterson v. Ferrell*, 349 P.3d 1269, 1274 (Kan. 2015).

[95] *Parsons*, 2022 WL 17544438, at *3 (quoting *Stephens v. Trust for Public Land*, 479 F Supp. 2d 1341, 1354 (N.D. Ga. 2007)); *see Young v. Hefton*, 173 P.3d 671, 674 (Kan. 2007) ("Whether there has been a contract repudiation within a reasonable time is a question of fact.).

### b. Failure to Hold Deposits in Escrow Account

As with the 8 mil Orders, the Court finds material issues of disputed fact remain on this claim, precluding Wipeco's motion for partial summary judgment with respect to the 4 mil Order on this ground.

### 3. Defendants' Affirmative Defenses

The Court turns to Defendants' affirmative defenses raised in opposition to Wipeco's motion and as grounds for their own motion for summary judgment. Defendants claim that several events delayed delivery of the gloves, including: (1) the manufacturer providing a non-conforming 8 mil sample; (2) a unilateral decision by the manufacturer to increase the price of the 8 mil Order; and (3) severe labor and container shortages, large wait times, void sailings, and other supply chain constraints. They argue that these intervening events resulting from the impact of the COVID-19 pandemic made its performance impracticable or functionally impossible, and thus it cannot be liable for breach of contract. The Court addresses these defenses in turn.

First, Defendants argue that any breach caused by Bluestem Management's failure to deliver the gloves is excused by the doctrine of impracticability. K.S.A. 84-2-615 states in pertinent part: "Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made." "Kansas courts recognize 'the important distinction between subjective ("I cannot do it") and objective ("the thing cannot be done") impracticability.'"[96] "Only objective

---

[96] *Mid-Am Bldg. Supply, Inc. v. Schmidt Builders Supply, Inc.*, No. 11-4167-KGS, 2013 WL 1308980, at *4 (D. Kan. March 29, 2013) (quoting *T.S.I. Holdings, Inc. v. Jenkins*, 924 P.2d 1239, 1248 (Kan. 1996)).

impracticability may serve to relieve a party of a contractual obligation."[97]  Thus, "where the promisor agrees to perform an act possible in itself, he will be liable for a breach of the contract even though contingencies not foreseen by him arise that make it difficult or even beyond his power to perform and which might have been provided against in the agreement."[98] "Impracticability may arise after the contract, in which case it is referred to as 'supervening,' or it may exist at the time of the contract, in which case it is referred to as 'original' or 'existing.'"[99]

Defendants fail to meet their burden to show that they are entitled to summary judgment on this affirmative defense.  As Wipeco notes, other than stating that it consistently notified Wipeco of delays, Bluestem fails to provide any analysis of this provision of the Kansas UCC, or any explanation of how or why it applies to the alleged breach of contract in this case.  Nor does Bluestem address all of the elements of the statute, in particular whether the purported commercial impracticability was supervening or original or whether it was objective or subjective.  Wipeco further argues that it placed its glove orders nearly a year into the COVID-19 pandemic and that any supply chain issues were fully foreseeable.  Defendants fail to address Wipeco's arguments in their reply brief and thus appear to have waived this argument.  Bluestem is denied summary judgment on this defense.

Defendants also fall short on their burden with respect to the *force majeure* defense.  That provision in the Gloves Terms Agreement states: "[d]ue to extreme volatility of PPE products, FORCE MAJEURE may apply."[100]  Wipeco argues that this provision is too vague to have any

---

[97] *T.S.I. Holdings, Inc.*, 924 P.2d at 1248 (citing *Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 970 (Kan. Ct. App. 1981)).

[98] *Columbian Nat'l Title Ins. Co. v. Twp. Title Servs., Inc.*, 659 F. Supp. 796, 802 (D. Kan. 1987) (citing *White Lakes Shopping Ctr., Inc. v. Jefferson Standard Life Ins. Co.*, 490 P.2d 609, 610 (Kan. 1971)).

[99] *City of Wellington v. Kan. Dept. of Health & Env't*, 431 P.3d 904 (Table), 2018 WL 6580495, at *14 (Kan. Ct. App. 2018) (quoting *Sunflower Elec. Coop.*, 638 P.2d at 969).

[100] Doc. 80-5.

meaning; because it has no definition of or description of the consequences of a *force majeure* event, or any explanation of when it "may" apply, there is no enforceable provision to enforce. Bluestem argues that the *force majeure* provision, in conjunction with the "no cancellation" and "no refunds" terms, shifted the risk to Wipeco for delays or breaches by the manufacturers.

Although the Gloves Terms Agreement merely recites boilerplate *force majeure* language, the Court agrees that Wipeco's interpretation of the provision as meaningless would create superfluity.[101]  Instead, the Supreme Court instructs that such a general recitation invokes a body of common law doctrine interpreting the term, including the requirement that the cause of a party's inability to perform be a supervening cause not anticipated by the parties.  This is so because in interpreting *force majeure* provisions, courts are attempting to ascertain where the parties placed the risk of a particular occurrence; where a particular risk exists or is foreseeable at the time of contracting, and the parties merely recite a general force-majeure provision, courts will presume the risk has been assumed by the party whose performance will be affected by the realization of that risk.[102]

"Under Kansas law, a party asserting commercial impracticability to excuse performance must establish that the performance, as agreed to in the contract, has become objectively impractical as a result of a particular event or condition, which the parties assumed would not occur."[103]  "Performance that has become merely more difficult or unprofitable is not enough to establish objective impracticability."[104]  Defendants have not presented evidence sufficient to

---

[101] *See Coshocton Grain Co. v. Caldwell-Baker Co.*, No. 14-cv-2589-DDC, 2017 WL 3605338, at *32 (D. Kan. Aug. 22, 2017) ("The court should avoid interpreting a contract in a manner that creates superfluity.").

[102] *See generally United States v. Winstar Corp.*, 518 U.S. 839, 904–910 (1996).

[103] *Kansas City Power & Light Co. v. Pittsburg & Midway Coal Min. Co.*, No. 88-2224 S, 1989 WL 151919, at *5 (D. Kan. Nov. 17, 1989) (citing *Sunflower Elec.*, 638 P.2d at 969).

[104] *Id.* (citing *Columbian Nat'l Title Ins. v. Township Title Serv.*, 659 F. Supp. 796, 802–03 (D. Kan. 1987)); *see* P.J.M. Declercq, *Modern Analysis of the Legal Effect of Force Majeure Clauses in Situations of Commercial*

establish that their performance under the Glove Terms Agreement became objectively impracticable as a matter of law and summary judgment on this defense is denied.[105]

### 4.    Claims Against Bluestem Healthcare and Johnson

Finally, the Court addresses whether Wipeco has sufficiently asserted breach of contract claims against Bluestem Healthcare and Johnson.  While Bluestem Healthcare and Johnson dispute in a footnote that they are parties to the contract with Wipeco or liable for any breach thereof, they do not move for summary judgment on these grounds.[106]  And despite naming Johnson personally on this claim, Wipeco does not assert an alter-ego or veil-piercing theory against him to disregard LLC protection.[107]  Other than broadly alleging that it was not clear which Bluestem entity it was dealing with in the glove sales transactions at issue here, Wipeco makes no allegations that there was a contract between Wipeco, on one hand, and either Bluestem Healthcare or Johnson on the other.[108]  Instead, the record indicates that the only parties to the contract at issue here are Bluestem Management and Wipeco.

Because Defendants do not advance this argument in their motion for summary judgment, Wipeco is entitled to "notice and a reasonable time to respond" before the Court may grant summary judgment on this basis with respect to his breach of contract claims against

---

*Impracticability*, 15 J.L. & Com. 213, 225 (1995) (discussing force-majeure clauses containing general language, which are construed in accordance with commercial impracticability law; noting that such construction devalues the clauses to nothing).

[105] In so ruling, the Court notes that it does not rule that these affirmative defenses are precluded as a matter of law and thus, they may be raised at trial, subject to the standards set forth herein.  *See Sunflower Elec. Coop., Inc. v. Tomlinson Oil Co.*, 638 P.2d 963, 969 (Kan. Ct. App. 1981) (explaining that while the ultimate issue of whether the defense of impossibility exists is a legal question, its determination rests on findings of fact appropriate to submit to a jury).

[106] *See* Doc. 80 n.4.

[107] *See Sampson v. Hunt*, 665 P2d 743, 751 (Kan. 1983) (explaining that the alter-ego doctrine imposes liability "on the individual who uses a corporation merely as an instrumentality to conduct his own personal business" to perpetrate fraud or injustice on third parties).

[108] *See* Doc. 76 at 9.

Bluestem Healthcare and Johnson.[109]  Accordingly, Wipeco is directed to file a submission, no later than 14 days from the entry of this Order, stating why summary judgment should not be granted to Bluestem Healthcare and Johnson with respect to the breach of contract claim on the grounds articulated above.  Defendants may file a response within 14 days from the date of Wipeco's submission; there shall be no replies.  The parties' submissions shall be limited to 15 pages.

### B.    Unjust Enrichment/Quantum Meruit

Wipeco moves for partial summary judgment against Bluestem Management in the event the Court finds that there was no enforceable contract between the parties.  Defendants contend that they are entitled to summary judgment on Wipeco's unjust enrichment claim because Wipeco has not disputed the existence or validity of the contract between the parties.  Wipeco acknowledges this result with respect to Bluestem Management, but argues that its alternative claim against Bluestem Healthcare and Johnson should survive because these Defendants dispute that they were parties to the contract.

Unjust enrichment/quantum meruit is an equitable doctrine that under Kansas law requires proof that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant retained the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust.[110]  Unjust enrichment falls under the category of quantum meruit and restitution, and these "are not available theories of recovery when a valid, written contract addressing the issue

---

[109] Fed. R. Civ. P. 56(f)(2); *see Peoples v. Baker*, 795 F. App'x 610, 613 (10th Cir. 2020) ("Although the sua sponte grant of summary judgment is disfavored, it is reversible error only if the losing party was not put on notice of the need to come forward with evidence and suffered prejudice.") (citing *Oldham v. O.K. Farms, Inc.*, 871 F.3d 1137, 1150 (10th Cir. 2017)).

[110] *See Estate of Draper v. Bank of America, N.A.*, 205 P.3d 698, 706 (Kan. 2009).

exists."[111]  "As between parties to a contract, Kansas courts will not invoke unjust enrichment for the benefit of either party, since their rights and obligations should be controlled by the agreement they have made."[112]

The question here is whether a claim for unjust enrichment may be invoked against nonparties to an enforceable contract on the claims.  Kansas law does not appear to categorically bar such an action when the nonparty retains a benefit conferred on that party under circumstances that would make retention of the benefit inequitable or unfair.[113]  Here, the Court has ordered supplemental briefing on the issue of whether Johnson and Bluestem Healthcare were parties to the contract and, while the record does not indicate that either of these Defendants retained the deposits, discovery is at a standstill regarding the issue of where Wipeco's deposits ended up.  Accordingly, summary judgment is denied as premature with respect to Wipeco's unjust enrichment claims against Bluestem Healthcare and Johnson and granted with respect to its claim against Bluestem Management.[114]

## C.      Fraud and Negligent Misrepresentation

Wipeco asserts two theories in support of its fraud and negligent misrepresentation claims against Bluestem Management and Johnson: (1) that Bluestem Management and Johnson made false statements regarding efforts to secure a refund of Wipeco's deposits from Sunshine Garden

---

[111] *Swimwear Solution, Inc. v. Orlando Bathing Suit, LLC*, 309 F. Supp. 3d 1022, 1037 (D. Kan. 2018) (citing *Ice Corp. v. Hamilton Sundstrand, Inc.*, 444 F. Supp. 2d 1165, 1170–71 (D. Kan. 2006)).

[112] *JA-DEL Inc. v. Winkler*, 432 P.3d 694 (Table), 2019 WL 166936, at *3 (Kan. Ct. App. Jan. 11, 2019) (citing *Midwest Asphalt Coating v. Chelsea Plaza Homes*, 243 P.3d 1106, 1110 (Kan. 2010)).

[113] *Id.* at 2019 WL 166936, at *2–3 (collecting cases).

[114] The Court declines to extend this ruling to Bluestem Management should the jury find against Wipeco on its breach of contract claims.  While Wipeco is correct that it may plead its unjust enrichment claim as an alternative theory of recovery, it cites no authority that it may pursue simultaneous breach of contract and unjust enrichment theories of recovery at summary judgment and trial.

on the 8 mil Orders; and (2) that Bluestem Management provided Wipeco with a forged bill of lading regarding a container of 4 mil gloves.  The elements of fraud are:

> (1) false statements that were made as a statement of existing and material fact; (2) the representations were known to be false by the party making them or were recklessly made without knowledge concerning them; (3) the representations were intentionally made for the purpose of inducing the other party to act upon them; (4) the other party reasonably relied and acted upon the representations made; and (5) the other party sustained damage by relying upon them.[115]

By contrast, while fraud requires proof defendant knew a statement was untrue, negligent misrepresentation merely requires proof that defendant failed to exercise reasonable care to obtain and communicate a true statement.[116]  Negligent misrepresentation "addresses negligence of knowledge of material facts and the transmittal of already known material facts."[117]

### 1.  Refund of Deposits

Defendants argue that Wipeco's allegations of fraud are not actionable because they are merely an improper attempt to turn a breach of contract claim into a tort.  The Court agrees.  "To maintain a fraud claim under Kansas law, the basis of the claim must be different from the conduct upon which a breach of contract claim is based."[118]  The fraud must also have resulted in damages greater than those caused by the breach of contract alone.[119]  Here, the basis for Wipeco's fraud claim is indistinguishable from its claim that Bluestem Management and Johnson breached the parties' contract by failing to refund its deposits on the 8 mil Orders.  Further,

---

[115] *Kelly v. VinZant*, 197 P.3d 803, 808 (Kan. 2008) (citations omitted); PIK Civ. 4th 127.40.

[116] *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citing *Mahler v. Keenan Real Estate, Inc.*, 876 P.2d 609, 616 (Kan. 1994)); PIK Civ. 4th 127.43.

[117] *Id.* (citing *Mahler*, 876 P.2d at 609).

[118] *Wade v. EMASCO Ins. Co.*, 483 F.3d 657, 675–76 (10th Cir. 2007) (citing and applying Kansas law).

[119] *Id.* (citations omitted).

Wipeco's allegation of detrimental reliance is that it was damaged by failing to take any further action under the contract in reliance on these Defendants' representations that they were pursuing a refund. This concession does not point to any fact supporting how this inaction caused damages flowing from that inaction. Instead, this amounts to nothing more than the damages caused by the breach of contract alone. Accordingly, Bluestem Management and Johnson's allegedly untrue statement in the form of representations about a refund does not support an actionable claim of fraud under Kansas law.

Wipeco argues that this rule does not apply to its negligent misrepresentation claims. The Kansas Supreme Court recognizes a claim of negligent misrepresentation where:

> One who, in the course of any transaction in which he or she has a pecuniary interest, supplies false information for the guidance of another person is liable for damages suffered by such other person caused by reasonable reliance upon the false information if: (1) the person supplying the false information failed to exercise reasonable care or competence in obtaining or communicating the false information; (2) the person who relies upon the information is the person for whose benefit and guidance the information is supplied; and (3) the damages are suffered in a transaction that the person supplying the information intends to influence.[120]

However, "the Kansas Supreme Court distinguishes negligent misrepresentation from misrepresentation of intention to perform an agreement because allowing a 'promise to perform to serve as the basis of a negligent misrepresentation claim' would mean that 'any breach of contract claim action could be treated as also including a negligent misrepresentation claim."[121] Wipeco's negligent misrepresentation claims are premised on the same statements that form the

---

[120] *Stechschulte*, 298 P.3d at 1097–98 (citing *Mahler*, 876 P.2d at 609); PIK Civ. 4th 127.43.

[121] *Wood v. LP Conversions, Inc.*, No. 14-2228-CM, 2016 WL 715772, at *7 (D. Kan. Feb. 22, 2016) (quoting *Rinehart v. Morton Bldgs., Inc.*, 305 P.3d 622, 631 (Kan. 2013)).

basis of its fraud claims, which are all promises to secure a refund of Wipeco's deposits.  These claims also fail as a matter of law under Kansas law.

### 2.      Draft Bill of Lading

Wipeco's second theory in support of its fraud and negligent misrepresentation claims is that Bluestem Management and Johnson provided it with a bill of lading to induce Wipeco to make a second payment on the 4 mil Order.  Wipeco argues that the bill of lading was a forgery, while Defendants contend that the bill of lading was a draft.  Regardless of the characterization of the bill of lading, it is uncontroverted that Wipeco did not make a second payment or take any other action in reliance on the bill of lading.  Accordingly, because Wipeco has not come forward with any evidence that it relied to its detriment or undertook any conduct linked to Bluestem Management and/or Johnson's representations regarding the bill of lading, it cannot meet an essential element of its claims.  Summary judgment is granted in favor of Defendants on the fraud claims in Count II and negligent misrepresentation claims in Count III.

**IT IS THEREFORE ORDERED BY THE COURT** that Wipeco's Motion for Partial Summary Judgment against Bluestem Management (Doc. 77) on the breach of contract claims in Count I and the unjust enrichment claims against Defendants in Count IV is **denied**;

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment(Doc. 79) : is **denied** on the breach of contract claims in Count I; is **granted** on the fraud and negligent misrepresentation claims against Bluestem Management and Johnson in Counts II and III; and **granted in part** against Bluestem Management and **denied in part** against Bluestem Healthcare and Johnson on the unjust enrichment claim in Count IV.

**IT IS FURTHER ORDERED** that Wipeco shall file a submission, no later than 14 days from the entry of this Order, stating why summary judgment should not be granted to Bluestem

Healthcare and Johnson with respect to Wipeco's breach of contract claim on the grounds articulated above.  Bluestem Healthcare and Johnson may file a response within 14 days from the date of Wipeco's submission; there shall be no replies.  The parties' submissions shall be limited to 15 pages.

**IT IS SO ORDERED.**

Dated: June 30, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
